IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

|  |  |
|---|---|
| FELICIA T. BOSTON, | * |
| Plaintiff, | * |
|  | * |
| v. | Civil Action No. PX 15-0132 |
|  | * |
| RAY MABUS, SECRETARY DEPARTMENT OF THE NAVY | * |
| Defendant. |  |

\*\*\*\*\*\*

**MEMORANDUM OPINION**

Pending in this employment discrimination case is Defendant's motion to dismiss the amended complaint, or in the alternative, for summary judgment (ECF No. 28). The issues are fully briefed and the parties were granted a hearing on the matter, which took place on December 8, 2016. ECF No. 37. This matter is ripe for determination. For the reasons stated below, Defendant's motion is GRANTED.

## I.      BACKGROUND[1]

### A.  Plaintiff Felicia Boston's History of Employment

Plaintiff Felicia T. Boston ("Boston" or "Plaintiff") is an African-American female born in 1958 and was employed as a civilian Information Technology Specialist, with the pay plan and grade of IA-04 (GG-13), at the Office of Naval Intelligence, Department of the Navy. ECF No. 27 at 2; ECF No. 35-1 at 2–3. Plaintiff worked for the Navy's Hopper Information Services Center (Hopper ISC) from June 2008 to September 2011 as the Requirements Team Lead. Declaration of Felicia T. Boston, ECF No. 35-1 at 2, 5. Plaintiff's job duties included providing "input related to requirements and business analysis functions to Statements of Work, Requests

---

[1] Unless otherwise noted, the facts here are construed in the light most favorable to the Plaintiff, the nonmoving party.

for Proposals, and costs estimates." ECF No. 35-1 at 4. Plaintiff "reviewed and provided comments to the Requirements Project Plans and approved the list of requirement management deliverable contained in the plan." ECF No. 35-1 at 4.

In February 2011, the Hopper ICS was reorganized, and Plaintiff was placed in the Control Department where she held a new title as the Governance Division Team Lead but continued to perform many of the same responsibilities. ECF No. 35-1 at 2, 5. Plaintiff's duties included leading the team responsible for requirements management and business processes, defining Governance Division tasks, roles and responsibilities, and assigning tasks to team members. ECF No. 35-1 at 4. Plaintiff directed team members in defining and analyzing requirements, documenting business processes, and identifying opportunities for process improvement. ECF No. 35-1 at 4. Plaintiff also evaluated contractor performance and provided training and guidance to the team. ECF No. 35-1 at 4.

On July 13, 2011, a notice was sent to all eligible employees concerning voluntary separation incentive pay ("VSIP") and voluntary early retirement authority ("VERA") for the Office of Naval Intelligence. *See* July 13, 2011 Memorandum, ECF No. 35-2; ECF No. 35-1 at 8. The deadline for employees to complete a survey of interest applying for VSIP and VERA was July 22, 2011. ECF No. 35-2 at 2.

On July 19, 2011, Plaintiff met with her immediate supervisor, Captain David Porcaro ("Capt. Porcaro"), who informed her that Defendant intended to disband the Governance Division and eliminate her position. ECF No. 27 at 3. Although the Governance Division functions would continue, the reorganization plan included other divisions absorbing those tasks and responsibilities.

At that same meeting, Capt. Porcaro praised Plaintiff's fine work and sought her input as to where she may prefer to work going forward. ECF No. 35-14; 35-12 (Gnibus Declaration "Capt. Porcaro asked Ms. Boston what she would like to do after the division was gone."). Porcaro offered many suggestions as to where Plaintiff may be relocated, including the Protection Department (computer security). *Id.* The Protection Department offer involved shepherding security packages through the accreditation process. ECF No. 35-1 at 5; ECF No. 35-5 at 7.

Plaintiff expressed her dissatisfaction with that offer. According to Plaintiff, but only according to Plaintiff, the Transformation position "would not be a position comparable with my skills and abilities and would not be a GG-13 position. It would be an administrative position. To maintain a G-13 in Computer Security, you must have the proper certifications, I do not." ECF No. 35-1 at 5; *see also* ECF No. 35-5 at 7. Procaro invited Plaintiff to suggest alternatives. ECF No. 35-15. Plaintiff told Porcaro she would think about it and get back to him. That same day, on July 19, 2011, Plaintiff signed and returned paperwork which conveyed her interest in taking early retirement. ECF No. 35-3 at 2.

After July 19, 2011 until her retirement in early September, Plaintiff took substantial vacation time. ECF No. 35-5 at 5; ECF No. 38. From July 20, 2011 to July 30, 2011, Plaintiff took off from work completely. ECF No. 38. And cumulatively, from July 20, 2011 to September 10, 2011, which consists of 38 work days, Plaintiff worked 41 hours of a total of 304 scheduled work hours, taking 87 hours of sick leave, 128 hours of annual leave, and 48 hours of compensatory time. ECF No. 38.[2] Plaintiff asserts that she did so because she was not given any

---

[2] From July 20, 2011 to July 30, 2011, Plaintiff took 48 hours of annual leave and 16 hours of sick leave. From July 31, 2011 to August 13, 2011, Plaintiff took 32 hours of annual leave and 8 hours of compensatory time. From August 14, 2011 to August 27, 2011, Plaintiff took 19 hours of sick leave and 40 hours of compensatory time. And from August 28, 2011 to September 10, 2011, Plaintiff took 32 hours of sick leave.

work by her managers, ECF No. 35-1 at 6, but this contention is belied by her taking ten days of leave immediately upon learning of the reorganization.

While on leave, her supervisor Jim Sigafoose offered her a position as the Defense Civilian Intelligence Personnel System Career Development Specialist for Hopper ISC, which she also turned down. ECF No. 35-1 at 9. According to Sigafoose, he expressed to Plaintiff that he was "impressed" with her "performance, experience and expertise, and that her talents and knowledge could definitely be used within the Command." ECF No. 35-9. Plaintiff contends now, as she did then, that she was not qualified for the position but offered no reasons as to why. ECF No. 35-5.

Plaintiff also inquired about another position known as a "Joint Duty Assignment." *Id.* She was provided with a job description that, in her estimation, was "not an Information Technology position. It was more in line with Facilities Management duties for which I have no skills or experience." ECF No. 35-5 at 5.

Seeking a job outside of Hopper ISC and within Naval Intelligence, Plaintiff also contacted Tim Sydnor, Chief Information Officer of the Office of Naval Intelligence ("Naval Intelligence"). ECF No. 35-1 at 7. Mr. Sydnor discussed with Capt. Porcaro the potential move, but it could not be accomplished because Hopper ISC did not intend to transfer Plaintiff's "billet" or personnel position. ECF No. 35-5 at 6; ECF No. 35-1 at 7.

On September 6, 2011, Plaintiff signed a Standard Form 52, Request for Personnel Action, for retirement special option. ECF No. 35-7. In consideration for Plaintiff's early retirement, Plaintiff received a lump sum payment of $25,000. *See* Notification of Personnel Action, ECF No. 35-8; ECF No. 35-15 at 83. Plaintiff alleges that she "could not continue to work in a hostile and abusive environment, subject [herself] to poor evaluations . . . by taking a

4

position that I was not qualified, and accept a position that did not support my present grade that could result in a downgrade based on erosion of duties." ECF No. 35-1 at 9.

At the center of Plaintiff's complaint is that while she elected early retirement, many other members of the Governance Team moved to other divisions but continued to do the same work. ECF No. 35-1 at 4; *see generally* ECF No. 35-9 at 5 ("The roles that the contractors on the Governance Team performed are still being performed by contractors . . . . Requirements management is conducted by other government civilian employees."). Specifically, Sigafoose moved some of Plaintiff's responsibilities to the Contract and Business Division which was headed by Kathy Vitkow, a younger Caucasian female who was later promoted. ECF No. 35-5 at 3, 7. Captain Vicky Gnibus, a younger Caucasian female, was moved to the Transition Division of the Hopper ISC and continued to perform many of the same functions that Plaintiff performed with the Governance Division. ECF No. 35-1 at 5. Don Billups, a younger African-American male subcontractor of L3 Inc., was appointed the Requirements Team Lead, which was part of Plaintiff's job and position before the February 2011 Hopper ISC reorganization. ECF No. 35-1 at 4–5; ECF No. 35-5. Clauzell McIntyre, a younger African-American male contractor of Eagle Ray Inc., began performing Plaintiff Boston's duties as the Subject Matter Expert. ECF No. 35-1 at 4–5; ECF No. 35-5 at 4. Mark Branham and Rik Sneeuwjagt, Caucasian male contractors of Eagle Ray Inc., were moved to another department doing the same job they did with the Governance Department. ECF No. 35-1 at 5. Sigafoose also offered Nehemiah Douglas, a younger[3] male civilian employee, a job managing an upcoming contract when Douglas

---

[3] The age of Douglas is a disputed fact. ECF No. 28-1 at 7; ECF No. 33-1 at 4. As long as Douglas is younger than Plaintiff, the fact that Douglas "may also in the class protected by the ADEA is not material. The Supreme Court has held that the ADEA does not require an employee in the protected class to lose his job to someone outside the protected class in order to state a claim. Rather, the essential point is that the plaintiff 'lost out *because of his [or her] age*.'" *Reed v. Buckeye Fire Equip.*, 241 F. App'x 917, 927

announced he was leaving Hopper ISC in August 2011. ECF No. 35-5 at 3. Despite her

qualifications, Plaintiff was not offered the position that Douglas received. ECF No. 35-5 at 3.

## B. Procedural History

On December 8, 2011, Plaintiff filed a formal complaint with the Office of Equal

Employment and Diversity of the Office of Naval Intelligence, which investigated the following

two allegations:

> a. Was the Complainant discriminated against based on sex
> (Female), race (African American) and age (DOB [1958]), when
> on or about July 19, 2011, she was informed by Captain David
> Porcaro, her immediate supervisor, that she was being removed
> from her position as Hopper Information Services Center, Team
> Lead for the Governance Division?
>
> b. Was the complainant discriminated against when as a result of
> her alleged removal from Governance Division Head, she was
> forced to elect retirement from service effective date September 3,
> 2011.

*See* ECF No. 35-11. Then, on August 31, 2011, Plaintiff filed a discrimination complaint with

the United States Equal Opportunity Commission ("EEOC"). On October 25, 2013, the EEOC

issued an Order of Dismissal Without Prejudice because it viewed Plaintiff's case as a mixed-

case complaint. *See* ECF No. 12. The case was later reprocessed as a mixed case complaint, and

Plaintiff filed an appeal with the Merit Systems Protection Board, which ultimately found it

lacked jurisdiction over Plaintiff's claims. ECF No. 11. In June 2014, Plaintiff filed a request for

reinstatement of her EEO Complaint, and Plaintiff commenced the above-captioned action on

January 15, 2015. ECF No. 11.

---

(4th Cir. 2007) (quoting *O'Connor v. Consol. Coin Caterers Corp.,* 517 U.S. 308, 312 (1996) (emphasis
in original)).

While this case was pending, on May 20, 2015, the EEOC granted Plaintiff's request for reinstatement of her EEO claims. As such, this Court permitted Plaintiff to withdraw her federal complaint without prejudice so that she could fully exhaust her administrative remedies. ECF No. 11. On August 31, 2015, the EEOC dismissed Plaintiff's complaint, and Plaintiff sought to reopen her federal action which this Court granted on November 16, 2015. ECF No. 17. A pre-motion telephone conference was held on December 21, 2015. ECF No. 21. With the Court's permission, Plaintiff filed an Amended Complaint on March 25, 2016. *See* ECF No. 27.

The counts of the Amended Complaint include Title VII violations of the terms and conditions of employment (Count I), racially discriminatory refusal to transfer (Count II), constructive discharge (Count III), and age discrimination under the ADEA (Count IV). ECF No. 27 at 5–11.

## II.      STANDARD OF REVIEW

Federal Rule of Civil Procedure 12(b)(6) provides for "the dismissal of a complaint if it fails to state a claim upon which relief can be granted." *Velencia v. Drezhlo*, No. RDB-12-237, 2012 WL 6562764, at *4 (D. Md. Dec. 13, 2012). When a defendant attaches documents to a motion to dismiss that are not "integral to the complaint" or where the documents' authenticity is disputed, the Court must treat the motion as one for summary judgment to consider the documents. *See CACI Int'l v. St. Paul Fire & Marine Ins. Co.*, 566 F.3d 150, 154 (4th Cir. 2009); *Syncrude Canada Ltd. v. Highland Consulting Grp., Inc.*, No. RDB-12-318, 2013 WL 139194, at *2 (D. Md. Jan. 10, 2013); Fed. R. Civ. P. 12(d). To be "integral," a document must be one "that by its 'very existence, and not the mere information it contains, gives rise to the legal rights asserted.'" *Chesapeake Bay Found., Inc. v. Severstal Sparrows Point, LLC*, 794 F. Supp. 2d 602, 611 (D. Md. 2011) (citation and emphasis omitted). The exhibits of Defendant's motion,

including declarations and depositions, are not integral to the complaint; thus, the Court will treat Defendant's pleading as a motion for summary judgment. *See* Fed. R. Civ. P. 12(d).

A court may enter summary judgment only if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Emmett v. Johnson*, 532 F.3d 291, 297 (4th Cir. 2008). However, summary judgment is inappropriate if any material fact at issue "may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); *JKC Holding Co. LLC v. Washington Sports Ventures, Inc.*, 264 F.3d 459, 465 (4th Cir. 2001).

"A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (quoting former Fed. R. Civ. P. 56(e)). "A mere scintilla of proof . . . will not suffice to prevent summary judgment." *Peters v. Jenney*, 327 F.3d 307, 314 (4th Cir. 2003). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Liberty Lobby*, 477 U.S. at 249–50 (citations omitted). At the same time, the court must construe the facts presented in the light most favorable to the party opposing the motion. *See Scott v. Harris*, 550 U.S. 372, 378 (2007); *Emmett*, 532 F.3d at 297.

### III.     ANALYSIS

Plaintiff alleges that she suffered discrimination based upon her sex (female), race (African-American), and age (52) when her position was dissolved and she was not given an appropriate new position or job duties and denied a transfer. Title VII prohibits discrimination based on an employee's personal characteristics such as "race, color, religion, sex, or national

origin." 42 U.S.C. § 2000e-2(a); *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2525

(2013). The ADEA prohibits employers from discriminating against employees or prospective

employees because of the individual's age. 29 U.S.C. § 623(a). The ADEA's protections apply to

individuals at least forty (40) years of age, 29 U.S.C. § 631(a), and do not permit "a mixed-

motives age discrimination claim." *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 175 (2009).

Instead, Plaintiff must "establish that age was the 'but-for' cause of the employer's adverse

action." *Id.* at 177.

　　To survive a motion for summary judgment, a plaintiff asserting a Title VII or ADEA

claim must provide evidence of intentional discrimination in one of two ways: (1) direct or

circumstantial evidence that discrimination motivated the employer's adverse employment

decision; or (2) the *McDonnell Douglas* "pretext framework" that requires a plaintiff to show

that the "employer's proffered permissible reason for taking an adverse employment action is

actually a pretext for [discrimination]." *Hill v. Lockheed Martin Logistics Management, Inc.*, 354

F.3d 277, 284-85 (4th Cir. 2004) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792

(1973)). "It is left to the plaintiff's discretion whether to proceed by direct and indirect evidence

or by mean of the *McDonnell Douglas* burden-shifting framework." *Foster v. Univ. of Maryland-*

*E. Shore*, 787 F.3d 243, 249 (4th Cir. 2015).

　　Plaintiff has proceeded under the *McDonnell Douglas* burden-shifting framework. ECF

No. 33-1 at 8. Under this framework, the plaintiff must establish a prima facie case of

discrimination by a preponderance of the evidence. Then, the burden shifts to the defendant who

must articulate a legitimate, nondiscriminatory reason for the adverse employment action. If the

defendant offers a legitimate reason, the burden shifts back to the plaintiff to demonstrate that the

reason offered by the employer is false. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

To establish a prima facie case of sex, race, and age discrimination, Boston must produce sufficient evidence to show that: (1) she is a member of a protected class; (2) she suffered adverse employment action; (3) she was performing her job duties at a level that met her employer's legitimate expectations at the time of the adverse employment action; and (4) the adverse employment action occurred under circumstances raising an inference of unlawful discrimination. *Webster v. Rumsfeld*, 156 F. App'x. 571, 578 (4th Cir. 2005) (quoting *Hill*, 354 F.3d at 285 (4th Cir. 2004)).

Plaintiff has satisfied the first and third elements of a prima facie case. As an African American, she is a member of a protected class. Further, Defendant does not contest that Plaintiff was performing her job duties at a level that met her employer's legitimate expectations. Plaintiff's claims, however, are not sustainable because she has failed to marshal sufficient evidence that she suffered an "adverse employment action" under the law. Plaintiff advances three theories of adverse employment action after the elimination of the Governance Division and Plaintiff's role: constructive discharge, demotion, and "racially discriminatory refusal to transfer." ECF No. 27 at 7. None survive challenge.

A legally cognizable adverse employment action "constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Hoyle v. Freightliner, LLC*, 650 F.3d 321, 337 (4th Cir. 2011) (citation omitted); *see also Holland v. Washington Homes, Inc.*, 487 F.3d 208, 219 (4th Cir. 2007) (internal quotation marks, citation, and alterations omitted). *Accord Brockman v. Snow*, 217 Fed. Appx. 201, 205 (4th Cir. 2007)

(quoting *Page v. Bolger*, 645 F.2d 227, 233 (4th Cir. 1981)) ("[I]n a discrimination case, our precedent mandates that the plaintiff has the higher burden of showing an 'ultimate employment' action that affects 'hiring, granting leave, discharging, promoting, and compensating.'"). "An action that merely causes an employee irritation or inconvenience, but does not affect a term, condition, or benefit of her employment, is not an adverse employment action." *Spriggs v. Public Serv. Comm'n of Maryland*, 197 F. Supp. 2d 388, 393 (D. Md. 2002).

Importantly, where "the effects of the adverse action have not yet been felt by the plaintiff, the action is mediate and therefore does not constitute employment action." *Howze v. Virginia Polytechnic*, 901 F. Supp. 1091, 1097 (W.D. Va. 1995) (citing *Jensvold v. Shalala*, 829 F. Supp. 131, 136–37 (D. Md. 1993) (distinguishing *Page* on similar grounds)). Essentially, "[s]teps in the process to a final decision . . . do not provide a basis for liability." *Id.* (citing *Page*, 645 F.2d at 233); *see also Caussade v. Brown*, 924 F. Supp. 693, 700 (D. Md. 1996), *aff'd*, 107 F.3d 865 (4th Cir. 1997) (" there are many interlocutory or mediate decisions having no immediate effect upon employment conditions which were not intended to fall within the direct proscription of § 717 and comparable provisions of Title VII.") (citation omitted). The Fourth Circuit has cautioned, however, that it "suggest[s] no general test for defining those 'ultimate employment decisions' which alone should be held directly covered by § 717 and comparable antidiscrimination provisions of Title VII." *Id.* With these basic principles in mind, the Court turns to each of Plaintiff's theories.

### a. Constructive Discharge

First, Plaintiff contends that she suffered adverse employment action as a victim of a constructive discharge because she was forced to retire. For this claim, Boston must show that the Department of the Navy deliberately made her working conditions "intolerable in an effort to

induce [her] to quit." *Matavia v. Bald Head Island Management*, 259 F.3d 261, 272 (4th Cir.

2001) (quoting *Martin v. Cavalier Hotel Corp.*, 48 F.3d 1343, 1354 (4th Cir. 1995)); *see also*

*Alba v. Merrill Lynch & Co.*, 198 F. App'x 288, 294 (4th Cir. 2006). Deliberateness can be

shown "by actual evidence of intent by the employer to drive the employee from the job, or

circumstantial evidence of such intent, including a series of actions that single out a plaintiff for

differential treatment." *Johnson v. Shalala*, 991 F.2d 126, 131 (4th Cir. 1993) (citing *Johnson v.*

*Bunny Bread Co.*, 646 F.2d 1250, 1256 (8th Cir. 1981) (stating that the "fact that employees

were treated identically rebuts any inference" of constructive discharge)).

The tolerability of working conditions is measured objectively. *Id.* When an employee

chooses to retire:

> 'Intolerability' is not established by showing merely that a
> reasonable person, confronted with the same choices as the
> employee, would have viewed resignation as the wisest or best
> decision, or even that the employee subjectively felt compelled to
> resign; presumably every resignation occurs because the employee
> believes that it is in his best interest to resign. Rather, intolerability
> . . . is assessed by the objective standard of whether a 'reasonable
> person' in the employee's position would have felt *compelled* to
> resign,'—that is, whether he would have had *no choice* but to
> resign.

*Blistein v. St. John's Coll.*, 74 F.3d 1459, 1468 (4th Cir.1996), *overruled on other*

*grounds by Oubre v. Entergy Operations, Inc.*, 522 U.S. 422 (1998) (emphasis in original); *see*

*also Green v. Brennan*, 195 L. Ed. 2d 44, 54 (2016) ("[P]laintiff must prove first that he was

discriminated against by his employer to the point where a reasonable person in his position

would have felt compelled to resign."); *Matvia v. Bald Head Island Mgmt.*, 259 F.3d 261, 273

(4th Cir. 2001) ("[D]issatisfaction with work assignments, a feeling of being unfairly criticized,

or difficult or unpleasant working conditions are not so intolerable as to compel a reasonable

person to resign.") (citing *Carter v. Ball*, 33 F.3d 450, 459 (4th Cir. 1994)); *Bristow v. Daily*

*Press, Inc.*, 770 F.2d 1251, 1255 (4th Cir. 1985) ("A constructive discharge occurs when "an employer deliberately makes an employee's working conditions intolerable and thereby forces him to quit his job."). Demotion "can constitute a constructive discharge, especially where the demotion is essentially a career-ending action or a harbinger of dismissal." *Carter*, 33 F. 3d at 459 (citing *Jurgens v. EEOC*, 903 F. 2d 386, 391–92 (5th Cir. 1990)).

Here, taking the evidence in the light most favorable to Plaintiff, she has, at best painted a picture of unsavory but not intolerable working conditions. According to Plaintiff, she was not provided any work or given any assignments from July 19, 2011, when she met with her supervisor Capt. Porcaro, to her retirement on September 6, 2011. Plaintiff further asserts that because she is a "workaholic," denial of assignments was unbearable. ECF No. 35-13 at 86.

Plaintiff's averments, however, are internally inconsistent and do not present the kind of evidence demonstrating workplace intolerability. Plaintiff at once calls herself a workaholic, but also voluntarily absented herself from work for almost all of the complained-of time frame between July 20, 2011, and September 10, 2011. Of the 38 work days, Plaintiff worked 41 hours of a total of 304 scheduled work hours, taking 87 hours of sick leave, 128 hours of annual leave, and 48 hours of compensatory time. ECF No. 38. Although Plaintiff notes that she took the time off because it was "humiliating" to come into work "every day with given nothing to do," her voluntary absence, the week and a half of vacation immediately following the July 19, 2011 meeting, undercuts her exposure to what she claims to be intolerable conditions.

Similarly, Plaintiff complains that prior to her extended vacation, she was relocated to another area where she was physically isolated and was met with staff "looking at me like I had the plague or something." ECF No. 35-13 at 86. Plaintiff's complaints, however, do not amount to an adverse employment action recognized under the law. *See Causade*, 924 F. Supp. at 703

13

(complaints of having office space taken away, forcing plaintiff nurse to work out of her trunk as well as suffering demeaning remarks about her skills were insufficient to sustain element of adverse employment action). Plaintiff's situation, even when considered most favorably to her, may have engendered heartfelt "dissatisfaction with work assignments, a feeling of being unfairly criticized, [and] difficult or unpleasant working conditions," but falls short of objective intolerability. *James v. Booz-Allen & Hamilton, Inc.,* 368 F.3d 371, 378 (4th Cir. 2004) (quoting *Carter*, 33 F.3d at 459) (internal quotation marks omitted); *see also. Carter*, 33 F. 3d at 459 ("'A slight decrease in pay coupled with some loss of supervisory responsibilities' is insufficient evidence of constructive discharge, however.") (quoting *Jurgens*, 903 F. 2d at 392). At most, Plaintiff endured these unpleasant circumstances for 41 working hours over the course of 38 work days. On a theory of constructive discharge, therefore, Plaintiff cannot marshal sufficient evidence to meet her prima facie burden.

### b. Demotion

Alternatively, Plaintiff contends that being offered a series of less than ideal positions effectively constituted a demotion and thus an adverse employment action. ECF No. 33-1 at 11. Where a new job assignment visits some significant detrimental effect, such as a "decrease in compensation, job title, level of responsibility, or opportunity for promotion," the reassignment can amount to an adverse employment action. *Holland*, 487 F.3d at 219 (citing *Boone v. Goldin*, 178 F.3d 253, 256–57 (4th Cir. 1999)). *Cf. Sedelnik v. City of Bridgeport*, 837 F. Supp. 2d 12 (D. Conn. 2011) (inference of discriminatory intent arose from age–related remarks and transfer of job duties to younger employees); *Yartzoff v. Thomas*, 809 F.2d 1371, 1376 (9th Cir. 1987) ("Transfers of job duties and undeserved performance ratings, if proven, would constitute

'adverse employment decisions' cognizable under this section.") (citing B. Schlei & P. Grossman, *Employment Discrimination Law* 554 (2d ed. 1983)).

However, "reassignment to a new position commensurate with one's salary level does not constitute an adverse employment action even if the new job does cause some modest stress not present in the old position." *Id.* "[A] purely lateral transfer, one that does not involve a demotion in form or substance, or a transfer involving no more than a minor change in working conditions, cannot rise to the level of a materially adverse employment action. These limits are intended to prevent 'every trivial personnel action that an irritable, chip-on-the-shoulder employee did not like' from forming the basis of a discrimination suit." *Mackey v. Shalala*, 43 F. Supp. 2d 559, 569 (D. Md. 1999), *aff'd*, 360 F.3d 463 (4th Cir. 2004) (quoting *Williams v. Bristol–Myers Squibb Co.*, 85 F.3d 270, 274 (7th Cir. 1996) (Posner, J.)).

Defendant notes that Plaintiff was offered three alternate positions. One was in the Protection Department, in Hopper ISC. The second as a Career Development Specialist for Hopper ISC, and the third in the Facilities Department. ECF 35-1 at 9. Plaintiff finds fault with each of the position. Specifically, Plaintiff argues that Capt. Porcaro's offer in the Protection Department was for a position out of grade and below Plaintiff's classification. Plaintiff refused the two other offers because she claims they were outside of her skill set and in roles for which she had no experience. ECF 35-1 at 9.

Plaintiff can point to no independent evidence apart from her assertions that these positions were anything more than possible lateral transfers. Notably, Plaintiff admitted at oral argument that these potential transfers would not have decreased her salary, changed her title, promotional opportunities or employment status. *See Fitzgerald v. Ennis Bus. Forms, Inc.*, No. 7:05 CV 00782, 2007 WL 81797, at *4 (W.D. Va. Jan. 8, 2007); *Wagstaff v. City of Durham*,

233 F. Supp. 2d 739, 745–45 (M.D.N.C. 2002), *aff'd*, 70 F. App'x 725 (4th Cir. 2003). *Cf.*

*Marlow v. Chesterfield Cty. Sch. Bd.*, 749 F. Supp. 2d 417, 430–31 (E.D. Va. 2010) (finding

adverse employment action where evidence of a decrease in pay, benefits, and demotion to a

position that plaintiff previously supervised and was two grade levels below her prior position).

Moreover, Plaintiff's supervisors, who praised Plaintiff for her years of exemplary service,

believed the positions to suit Plaintiff's training and experience. *See* ECF No. 35-9 at 7; ECF No.

35-14 at 2. As a result, apart from Plaintiff's protestations, nothing in the record demonstrates

that these alternative options constituted an adverse employment action.

Equally fatal to Plaintiff's claim is that she availed herself of early retirement *before* the

transfer process was final. During the back and forth offer and denial of the above positions prior

to retirement, Plaintiff's supervisors never presented a final take-it-or-leave-it alternate. In this

regard, the final effects of Plaintiff's claimed adverse action had "not yet been felt by the

plaintiff." *Howze*, 901 F. Supp. at 1097. The discussions were rather "steps in the process to a

final decision," and as such "are merely mediate," which "do not provide a basis for liability." *Id.*

(citing *Page,* 645 F.2d at 233). *See also James*, 368 F.3d at 376 ("Speculation about the future

adverse consequences of a reassignment may not rise to the level of a genuine dispute.");

*Mitchell v. Vanderbilt*, 389 F.3d 177 (6th Cir. 2004). Thus, even when considered most favorably

to Plaintiff, she has failed to produce sufficient evidence that she was demoted.

### c. Denial of Transfer

Lastly, Plaintiff asserts that the refusal to grant her transfer was an adverse employment

action. Similar to Plaintiff's demotion theory, a refusal to grant a transfer does not amount to an

adverse employment action unless it "had some significant detrimental effect" on the employee,

such as reduced pay, a diminished opportunity for promotion, less responsibility, or a lower

rank. *Wagstaff,* 233 F. Supp. 2d at 745 (citing *Boone,* 178 F.3d at 256 (4th Cir.1999)); *see*

*also Brown v. Brody,* 199 F.3d 446, 456–57 (D.C.Cir.1999). A "'transfer that does not involve a

demotion in form or substance [ ] cannot rise to the level of a materially adverse employment

action." *Brown,* 199 F.3d at 456–57 (quoting *Ledergerber v. Stangler,* 122 F.3d 1142, 1144 (8th

Cir. 1997); *Williams,* 85 F.3d at 274). The rule regarding transfers applies with equal force to the

denial of transfer requests. *See Wagstaff*, 233 F. Supp. 2d at 745 (citing *LePique v. Hove*, 217

F.3d 1012, 1014 (8th Cir.2000) (finding "no reason to suppose" that a failure to transfer should

be "treated any differently" than an actual transfer)).

      Here, although the evidence taken most favorably to Plaintiff shows that she was denied

her requested transfer to the Chief Information Office, no evidence demonstrates that the denial

lead to diminished pay, reduction in rank, or less responsibility in the final determination. Rather,

Plaintiff took early retirement prior to any final decision regarding a new placement. As such,

Plaintiff cannot demonstrate at trial that the denial of transfer led to the kinds of adverse

consequences actionable under law.

      Because Plaintiff cannot sustain her burden in demonstrating that she suffered an adverse

employment action, Plaintiff's emphasis on proffered "comparators" is of little help. *See Wright*

*v. Kent County Dept. of Social Services*, ELH-12-3593, 2014 WL 301026, at *17 n.14 ("Because

I conclude that plaintiff has not adequately pleaded an adverse employment action, I need not

reach defendant's argument based on plaintiff's failure to identify a similarly situated

comparator."). Routinely, comparator evidence is used to decide "whether an adverse

employment action was driven by a discriminatory motive." *Liang v. Federal Express Corp.*, 703

F.3d 713, 719 (4th Cir. 2013). Comparator evidence has also been used in rebutting a

defendant's claims of legitimate business reasons for adverse employment actions, shoring up a

plaintiff's claims that such reasons are pretextual. *See generally Walker v. St. Joseph's/Candler Health Sys.*, Inc., 506 F. App'x 886, 889 (11th Cir. 2013) (citing *Silvera v. Orange County Sch. Bd.*, 244 F.3d 1253, 1259 (11th Cir.2001) ("A typical means of establishing pretext is through comparator evidence."). Simply put, such evidence is used to demonstrate that the adverse action was motivated by improper discriminatory considerations. However, where, as here, the evidence considered most favorably to Plaintiff does not constitute an "adverse employment action" under the law, the Court need not consider whether Plaintiff's comparators are adequate or proper.

## IV. CONCLUSION

In sum, the facts even when viewed most favorably to Plaintiff, do not give rise to objectively intolerable working conditions compelling Plaintiff to retire. Further, Plaintiff has failed to produce sufficient evidence that she suffered an adverse employment action. Accordingly, Defendant's motion shall be granted. A separate order will follow.

12/13/2016 _____                    _____/S/_____
Date                                                 Paula XinisPaula Xinis
                                                     United States DistrictDistrict Judge